IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DALTON WATT BOND, | ) |
| Plaintiff, | ) Civil Action No. 09-263 Erie |
| v. | ) District Judge McLaughlin |
| | ) Magistrate Judge Baxter |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, | ) |
| Defendant. | ) |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

**I.    RECOMMENDATION**

Plaintiff Dalton Watt Bond ("Bond") commenced this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits under Title II of the Social Security Act ("Act") [42 U.S.C. §§ 401-433]. The matter is presently before the Court on cross-motions for summary judgment filed by the parties pursuant to Federal Rule of Civil Procedure 56. It is respectfully recommended that Bond's motion for summary judgment (*Document No. 6*) be denied, that the Commissioner's motion for summary judgment (*Document No. 9*) be granted, and that the administrative decision of the Commissioner be affirmed.[1]

**II.    REPORT**

   **A.    Procedural History**

Bond protectively applied for disability insurance benefits on August 2, 2007, alleging disability as of August 18, 2004. (Tr. 78, 101). Bond ails from a back disorder and a thyroid disorder. (Tr. 11-12). The claim was administratively denied on October 18, 2007. (Tr. 64). Bond responded on December 6, 2007, by filing a timely request for an administrative hearing. (Tr. 71). On April 30, 2009, a hearing was held before Administrative Law Judge Irving A. Pianin (the "ALJ").[2] (Tr. 19). Bond, who was represented by counsel, appeared and testified at the hearing. (Tr. 23-43). Paula Day ("Day"), an impartial vocational expert, also testified at the hearing. (Tr. 43-45). In a decision dated May 8, 2009, the ALJ determined that Bond was not

---
[1] The fourth sentence of 42 U.S.C. § 405(g) provides the Court with the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).
[2] In his opinion, the ALJ stated that he had presided over the administrative hearing from Norfolk, Virginia, by means of an electronic apparatus, and that Bond had appeared and testified in Erie, Pennsylvania. (Tr. 9). The transcript of the hearing indicates that the proceedings were conducted in Philadelphia, Pennsylvania. (Tr. 19). Given this discrepancy, it is not entirely clear where the hearing took place.

1

"disabled" within the meaning of the Act. (Tr. 6-18). The Appeals Council denied Bond's request for review on August 26, 2009, thereby making the ALJ's decision the final decision of the Commissioner in this case. (Tr. 1). Bond commenced this action on October 16, 2009, seeking judicial review of the Commissioner's decision. (Doc. No. 1). Bond and the Commissioner filed motions for summary judgment on May 17, 2010, and July 28, 2010, respectively. (Doc. Nos. 6 & 9). These motions are the subject of this report and recommendation.

### B. Standard of Review

This Court's review is plenary with respect to all questions of law. *Schaudeck v. Commissioner of Social Security Administration*, 181 F.3d 429, 431 (3d Cir. 1999). With respect to factual issues, judicial review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)(internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or

her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)(footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision.

### C. The ALJ's Decision

In his decision, the ALJ determined that Bond had not engaged in substantial gainful activity subsequent to his alleged disability onset date.[3] (Tr. 11). Bond was found to be suffering from a back disorder and a thyroid disorder. (Tr. 11-12). His back disorder was deemed to be "severe" within the meaning of 20 C.F.R. § 404.1520(a)(4)(ii), while his thyroid disorder was deemed to be "non-severe." (Tr. 11-12). The ALJ concluded that Bond's impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listing of Impairments" or, with respect to a single impairment, a "Listed Impairment" or "Listing"). (Tr. 12).

In accordance with 20 C.F.R. § 404.1545, the ALJ assessed Bond's residual functional capacity as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR § 404.1567(b) with the following exceptions: he must be permitted to sit or stand at will in order to relieve pain or discomfort; he can perform no more than occasional postural activities (climbing, balancing, stooping, kneeling, crouching, and crawling); and he is precluded from working at heights or in hazardous environments.

(Tr. 12). Bond had past relevant work experience as a truck driver. (Tr. 16). At the hearing, Vocational Expert Day classified this position as a "semi-skilled"[4] job at the "medium"[5] level of

---

[3] During the course of the administrative hearing, Bond amended his alleged onset date to April 30, 2005. (Tr. 22). The ALJ determined that Bond had not engaged in substantial gainful activity subsequent to his original onset date of August 18, 2004. (Tr. 11).
[4] "Semi-skilled work is work which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex

4

exertion. (Tr. 44). Because Bond was found to be limited to "light"[6] work, it was determined that he could not return to his past relevant work. (Tr. 16).

Bond was born on July 6, 1960, making him forty-four years old on his alleged onset date and forty-eight years old on the date of the ALJ's decision. (Tr. 16, 78). He was classified as a "younger person" under the Commissioner's regulations. 20 C.F.R. § 404.1563(c). He had a "limited"[7] education and an ability to communicate in English. (Tr. 16, 24); 20 C.F.R. § 404.1564(b)(3), (5). Given the applicable residual functional capacity and vocational assessments, the ALJ concluded that Bond could work as an office helper, an order caller, or a warehouse checker. (Tr. 17). Day's testimony established that these jobs existed in the national economy for purposes of 42 U.S.C. § 423(d)(2)(A).[8] (Tr. 44-45).

### D. Background

Bond sustained a work-related back injury on August 17, 2004, after falling out of a truck. (Tr. 299). A magnetic resonance imaging ("MRI") scan conducted on October 27, 2004, revealed that he was suffering from two disc herniations, canal stenosis and nerve root impingement. (Tr. 176). On December 2, 2004, Bond applied for benefits under Pennsylvania's Workers' Compensation Act. (Tr. 83). Nevertheless, he continued to work as a truck driver until April 28, 2005, "at which point he could no longer perform his job effectively." (Tr. 299). During the course of the administrative hearing conducted in this case, Bond changed his alleged onset date from August 18, 2004, to April 30, 2005. (Tr. 22). He presumably took this action because he had continued to work subsequent to his original onset date.

By July 15, 2005, Bond was considering surgical options to alleviate the pain in his back. (Tr. 199). Dr. Raymond Bridge determined that Bond was suffering from lumbar radiculopathy. (Tr. 199). Bond underwent an independent medical examination on July 25, 2005, in connection

---

than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks." 20 C.F.R. § 404.1568(b).

[5] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

[7] An individual is deemed to have a "limited" education if he or she has completed anywhere from the seventh grade to the eleventh grade of formal schooling. 20 C.F.R. § 404.1564(b)(3). Bond testified at the hearing that he had dropped out of school when he was in the eleventh grade. (Tr. 24).

[8] At the fifth step of the sequential evaluation process, "the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, [he or] she can perform work that exists in significant numbers in the regional or national economy." *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003). This burden is commonly satisfied by means of vocational expert testimony. *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005).

with his application for workers' compensation benefits.[9] (Tr. 177-180). The examination was performed by Dr. Mark R. Foster. Based on his examination findings, Dr. Foster opined that Bond's back had not worsened after the incident of August 17, 2004, and that the objective evidence of an impairment could be linked to a preexisting back injury dating back to 1994. (Tr. 179). Dr. Foster reported that Bond could continue working as a truck driver if his commercial driver's license were to be renewed. (Tr. 179).

In a treatment note dated September 27, 2005, Dr. Bridge made the following observations about Bond's activities:

> He tells me that he has been exercising on a treadmill for 30 minutes daily and walking. He does better walking on turf than he does on concrete or pavement of any sort. He tells me that so long as he takes appropriate rest breaks that he can walk for quite some time.
>
> Prolonged sitting is a problem as it has been. He recently did a six hour trip to the State of Kentucky. He stopped several times. He tells me that his foot will "fall asleep" when he drives for more than about an hour. He did not pass many rest stops as a consequence.
>
> The treadmill and exercise bike and walking are done daily. Recently his son gave him a set of free weights and he is going to start doing some upper body work.

(Tr. 195). As of November 2, 2005, Bond was still using a treadmill to exercise on a daily basis. (Tr. 192).

Bond underwent transforaminal epidural injections on December 9, 2005, and January 6, 2006, to alleviate his back pain. (Tr. 181-184). The injections were administered by Dr. Jithendra Rai. (Tr. 181-184). Dr. Bridge reported on January 10, 2006, that while Bond had been walking and pedaling a stationary exercise bike on a regular basis, he had not been driving for long periods of time because of the discomfort that it would cause him. (Tr. 191).

Bond underwent a lumbar laminectomy and bilateral foraminotomies on May 16, 2006. (Tr. 297-298). The surgery was performed by Dr. James D. Kang. Three weeks later, Dr. Kang expressed the hope that Bond would be able to return to work. (Tr. 295). Dr. Kang observed on September 11, 2006, that Bond was eager to return to his job as a truck driver, and that he would most likely be able to do so within two to three months. (Tr. 294). On October 20, 2006, Bond agreed to settle his workers' compensation claim. (Tr. 83).

---

[9] The independent medical examination was apparently conducted for the purpose of determining whether Bond's back problems had been caused by the incident of August 17, 2004, or whether they had resulted from an earlier injury. (Tr. 198).

Since Bond continued to experience back discomfort, Dr. Stephen J. Hardy recommended that another MRI scan be conducted. The MRI scan, which was conducted on May 3, 2007, revealed that Bond was suffering from epidural fibrosis and a recurrent central disc herniation. (Tr. 259). After Dr. Hardy left the practice of medicine, Bond sought treatment from Dr. Denise Falk. (Tr. 282). Dr. Falk recommended that Bond seek additional follow-up treatment from Dr. Kang. (Tr. 279). After examining Bond on September 10, 2007, Dr. Kang made the following observations:

> I told Dalton that he is having some mechanical lower back pain. Whether he needs a lumbar fusion in my opinion is in question. However, based on the report, I do not think lumbar fusion would benefit him at all at this point. I recommend continued pain management and simply hang in there with his symptoms. He should try to take some time off and then return to work. I do not think he is going to damage anything by trying to return to work. He will have some indolent symptoms on and off, as the disk is going through some arthritic changes. Lumbar fusion will not change any of this at this point. I told him I would be happy to review his MRIs personally, so he will have them directly mailed to me. I will call him once I have reviewed the studies if my opinions have changed.

(Tr. 289, 291). Dr. Kang subsequently relayed his impressions of Bond's condition to Dr. Falk. (Tr. 290).

Dr. Mary Ellen Wyszomierski, a non-examining medical consultant, opined on October 5, 2007, that Bond could perform a limited range of light work involving only occasional climbing, balancing, stooping, kneeling, crouching or crawling, provided that he was not even "moderately" exposed to vibration and other work-related hazards. (Tr. 306-310). She found his subjective complaints of pain to be "partially credible." (Tr. 312). In making this determination, Dr. Wyszomierski gave some consideration to Dr. Kang's view that Bond could return to his previous work as a truck driver. (Tr. 312).

Bond continued to seek treatment from Dr. Falk and her associate, Dr. John E. Balmer. (Tr. 313-331). On February 21, 2008, Dr. Falk indicated that back pain had caused Bond to decrease the level of his activities. (Tr. 328). It was noted on October 3, 2008, that Bond had been experiencing constant "discomfort" in his lower back, which he could alleviate by "laying flat." (Tr. 322). As of January 6, 2009, Bond was telling Dr. Falk and Dr. Balmer that he needed to lie down intermittently throughout the day in order to control his back pain. (Tr. 319). He stated that his right foot would become numb when he engaged in prolonged walking or sitting. (Tr. 319). In a treatment note dated February 23, 2009, Dr. Falk stated that Bond sometimes needed to lie down for ten minutes to an hour, depending on how much walking and

bending he was doing. (Tr. 316). She explained that Bond had stopped walking within the previous six months, since it had exacerbated his back pain. (Tr. 316).

On March 16, 2009, Dr. Falk completed a medical statement form describing the nature of Bond's impairments and resulting limitations. (Tr. 315). She reported that Bond suffered from chronic pain, that such pain prevented him from standing or sitting for prolonged periods of time, and that it was "reasonably necessary" for him to lie down "at unpredictable times" in order to "obtain pain relief." (Tr. 315).

### E. Discussion

At the hearing, Bond testified that he would lie down for two to three hours during the course of a typical day. (Tr. 40). He stated that he could sit or stand for thirty to forty-five minutes before he would need to change positions. (Tr. 39-40). Day testified that while an individual who needed a sit/stand option could work as an office helper, an order caller or a warehouse checker, these positions were not compatible with an individual who needed to lie down periodically during the course of a typical workday. (Tr. 45).

In determining that Bond was capable of performing a limited range of light work, the ALJ accorded "significant weight" to Dr. Wyszomierski's consultative assessment. (Tr. 15). He gave "little weight" to Dr. Foster's opinion that Bond could return to his previous job as a truck driver. (Tr. 15). Although Dr. Falk's opinion was considered, the ALJ concluded that the objective evidence contained in the record did not support the view that Bond needed to periodically lie down at unpredictable times. (Tr. 15). The ALJ addressed Bond's subjective complaints and testimony by providing him with a sit/stand option. (Tr. 15).

The main issue in this case is whether the ALJ erred in rejecting Bond's contention that he needed to lie down periodically during the course of a typical day. This contention was supported by both Dr. Falk's written statement of March 16, 2009, and Bond's testimony at the hearing. (Tr. 39-40, 315). Had this limitation been accepted by the ALJ, Day's testimony would have compelled the conclusion that Bond was disabled. (Tr. 45).

The United States Court of Appeals for the Third Circuit has explained that it is generally improper for an administrative law judge to credit the opinion of a non-examining medical consultant when that opinion conflicts with an opinion rendered by a claimant's treating physician. *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 357 (3d Cir. 2008). Bond asserts that the ALJ violated this precept by adopting Dr. Wyszomierski's assessment

rather than that provided by Dr. Falk. (Doc. No. 7 at 21-22). He attempts to cabin the Court's inquiry by stating that Dr. Wyszomierski's report was the only "opinion evidence" relied upon by the ALJ in rejecting Dr. Falk's opinion. (Doc. No. 11 at 6). Bond is wrong in both respects. First of all, the ALJ expressly referenced Dr. Foster's examination report while discussing the "opinion evidence" contained in the record. (Tr. 15). Dr. Foster, of course, had opined on July 25, 2005, that Bond could return to his previous work as a truck driver. (Tr. 179). Although the ALJ accorded "little weight" to Dr. Foster's view that Bond could return to his past relevant work, he nevertheless observed that Dr. Foster's opinion "might have been appropriate" at the time of the independent medical examination. (Tr. 15). Second, the ALJ extensively discussed Dr. Kang's findings in his decision. (Tr. 14). Dr. Kang had recommended that Bond consider returning to work. (Tr. 289, 291). While the ALJ did not specifically refer to Dr. Kang's recommendation as "opinion evidence," it is clear from the ALJ's evaluation of the evidence that Dr. Kang's findings were taken into consideration. (Tr. 14-15). A reviewing court may view an administrative law judge's opinion as a whole when evaluating the basis for his or her decision. *Chanbunmy v. Astrue*, 560 F.Supp.2d 371, 381 (E.D.Pa. 2008)(considering an administrative opinion as a whole in determining whether "substantial evidence" supported a specific finding at the third step of the sequential evaluation process). Since the ALJ clearly relied on the findings of both Dr. Foster and Dr. Kang in determining Bond's residual functional capacity, there is no reason for the Court to proceed as if Dr. Falk's opinion had been rejected solely on the basis of Dr. Wyszomierski's assessment.

It is true that an opinion rendered by a treating physician is entitled to considerable weight under the governing law. *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). Nonetheless, this principle must not be viewed in isolation. All medical reports (*i.e.*, reports submitted by treating, examining and non-examining physicians) are to be regarded as competent medical evidence, regardless of how much (or how little) weight they are ultimately accorded. *Williams v. Sullivan*, 970 F.2d 1178, 1185, n. 5 (3d Cir. 1992). Furthermore, where a conflict in the evidence exists, an administrative law judge "is free to choose the medical opinion of one doctor over that of another." *Diaz v. Commissioner of Social Security*, 577 F.3d 500, 505 (3d Cir. 2009).

In this case, no medical opinion was fully credited (or fully rejected) by the ALJ. While the ALJ partially rejected the opinions of Dr. Foster and Dr. Kang in determining that Bond

could no longer work as a truck driver, he partially credited those opinions by concluding that Bond was not totally precluded from engaging in substantial gainful activity. (Tr. 14-16). Dr. Wyszomierski's assessment did not provide for a sit/stand option, but the ALJ included one within his residual functional capacity finding in order to partially credit both Dr. Falk's opinion and Bond's subjective complaints. (Tr. 15, 306-312). By giving "significant weight" to Dr. Wyszomierski's opinion, the ALJ rejected the opinions of Dr. Foster and Dr. Kang, both of whom had expressed the view that Bond should try to resume his duties as a truck driver. (Tr. 14-15). The Court must show deference to the ALJ's "evaluation of the evidence, assessment of the credibility of witnesses, and reconciliation of conflicting expert opinions." *Diaz*, 577 F.3d at 506.

Bond points to treatment notes provided by Dr. Falk and Dr. Balmer in support of his contention that he needed to lie down periodically during the course of a typical day. (Doc. No. 7 at 26; Doc. No. 11 at 3). On October 3, 2008, Dr. Balmer noted that Bond was complaining of constant discomfort in his lower back.[10] (Tr. 322). This discomfort was apparently exacerbated when Bond was "bending." (Tr. 322). Dr. Balmer observed that Bond would alleviate this discomfort "by laying flat." (Tr. 322). Dr. Balmer reported on January 6, 2009, that Bond needed "frequent rest periods," that "laying down" was the only way that he could relieve his pain, and that he needed to lie down "intermittently" throughout the course of a typical day. (Tr. 319). Bond evidently told Dr. Balmer that these symptoms had been worsened by cold weather. (Tr. 319). On February 23, 2009, Dr. Falk indicated that Bond often needed to lie down for ten minutes to an hour in order to relieve his back pain, "depending on how much bending and walking" he had been doing. (Tr. 316). Dr. Falk further observed that Bond would experience more pain while standing in one spot for more than five minutes than he would while walking. (Tr. 316). She stated that more than ten minutes of walking would "agitate" Bond's back. (Tr. 316).

At the hearing, the ALJ questioned Bond about the medications that he was using in order to alleviate his back pain. (Tr. 32, 39). Bond testified that Hydrocodone was effective in controlling his symptoms, but that he did not always have large quantities of the drug. (Tr. 32). He later stated that Dr. Falk only provided him with up to ten Vicodin or Percocet pills at a time, and that she would provide him with larger quantities only if he would agree to provide her with

---

[10] It is not clear whether this treatment note was authored by Dr. Balmer himself, or whether it was written by a certified physician's assistant. The note was signed by both Dr. Balmer and a physician's assistant. (Tr. 323). The name of the physician's assistant is illegible.

a urine sample. (Tr. 39). Bond explained that he had declined this offer because he could not afford to pay the cumulative price of a medical examination, urine test and prescription. (Tr. 39). In his decision, the ALJ acknowledged Bond's testimony concerning the effectiveness of his medications. (Tr. 15). It was appropriate for the ALJ to consider this factor in evaluating Bond's credibility as a witness. 20 C.F.R. § 404.1529(c)(3).

In an apparent attempt to circumvent the opinions of Dr. Foster, Dr. Kang and Dr. Wyszomierski, Bond argues that he was not required to show that he was disabled *as of his alleged onset date* in order to establish that he was "disabled" under the Act. (Doc. No. 7 at 15-16). He insists that Dr. Falk's opinion (*i.e.*, her view that he needed to lie down periodically during the course of a typical day "at unpredictable times") was not contradicted by other *recent* medical evidence. (Doc. No. 7 at 23). In other words, Bond contends that the opinions of Dr. Foster, Dr. Kang and Dr. Wyszomierski were essentially outdated as of March 16, 2009, when Dr. Falk submitted her written statement.

While this argument is not completely without force, it is a double-edged sword in this instance. In order to establish the existence of a disability under the Act, a claimant must demonstrate that both his or her *medically determinable impairment* and his or her *inability to work* have lasted (or are expected to last) for a period of twelve months. *Barnhart v. Walton*, 535 U.S. 212, 214-222, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002). Bond's alleged need to alleviate his back pain by lying down was *first* noted on October 3, 2008, which was only about seven months prior to the issuance of the ALJ's decision. (Tr. 322). Even if Dr. Falk's opinion had been fully credited, an issue would have remained as to whether the durational requirement of the Act had been satisfied. In his decision, the ALJ acknowledged that Bond had "alleged" the existence of additional impairments and limitations which had not existed for the statutory twelve-month period. (Tr. 12). The ALJ's analysis was sufficient to justify the rejection of Bond's alleged need to lie down periodically, since there was no evidence that such a limitation had lasted long enough (or was expected to last long enough) to satisfy the Act's twelve-month durational requirement.[11]

It is also worth noting that the alleged deterioration in Bond's condition during the fall of 2008 was not corroborated by objective medical evidence. The references to Bond's need to lie down were included within the "subjective" portions of Dr. Falk's treatment notes. (Tr. 316,

---

[11] A treatment note dated January 6, 2009, referenced cold weather as a factor contributing to Bond's symptoms. (Tr. 319).

319, 322). They were not grounded in medical evidence aside from Bond's subjective complaints. A lack of clinical data to support a proposed limitation can constitute evidence that the limitation is not truly present. *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985). The ALJ, of course, was required to give serious consideration to Bond's subjective complaints of pain. *Mason v. Shalala*, 994 F.2d 1058, 1067-1068 (3d Cir. 1993). The ALJ obviously considered Bond's testimony in determining his residual functional capacity. The sit/stand option identified by the ALJ was specifically designed to account for Bond's subjective complaints. (Tr. 15). Although the ALJ was required to *seriously consider* Bond's subjective complaints, he was not required to account for every limitation *alleged* by Bond. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). By providing Bond with a sit/stand option and limiting him to only occasional postural maneuvers, the ALJ eliminated jobs requiring the performance of tasks that would have exacerbated Bond's pain and increased the likelihood that he would need to lie down at work.[12] (Tr. 12-16, 316, 322).

At the hearing, Bond testified that he went turkey hunting two to three times per week. (Tr. 35). He explained that this involved sitting inside of a camouflaged "blind" and waiting for a turkey to appear. (Tr. 42). The "blind" was six feet long and four feet wide. (Tr. 42). In response to a question posed by his counsel, Bond testified that he would assume various sitting, lying and kneeling positions while hunting. (Tr. 43). The ALJ opined that this activity was "not consistent with debilitating limitations." (Tr. 16). Relying on *Frankenfield v. Bowen*, 861 F.2d 405 (3d Cir. 1988), Bond argues that his "sporadic and transitory" hunting activities were not indicative of an ability to perform the duties of a full-time job. (Doc. No. 11 at 7). In *Frankenfield*, the United States Court of Appeals for the Third Circuit held that it was improper for an administrative law judge to reject the opinions of three treating physicians *solely* on the basis of a claimant's ability to take care of his personal needs, perform limited household chores, and attend church. *Frankenfield*, 861 F.2d at 408. The ALJ did not act contrary to the holding in

---

[12] Although Bond challenges the ALJ's residual functional capacity assessment, he does not independently challenge the ALJ's corresponding hypothetical question to Day. In order for a vocational expert's testimony to constitute competent evidence of the existence of jobs in the national economy consistent with a claimant's residual functional capacity, the administrative law judge's hypothetical question must adequately convey to the vocational expert *all* of the claimant's credibly established limitations. *Ramirez v. Barnhart*, 372 F.3d 546, 552-555 (3d Cir. 2004). If the hypothetical question omits a credibly established limitation, there is a danger that the vocational expert will identify jobs requiring the performance of tasks that would be precluded by the omitted limitation. *Burns v. Barnhart*, 312 F.3d 113, 122-124 (3d Cir. 2002). The transcript of the hearing indicates that when the ALJ formulated his hypothetical question to Day, he asked for jobs that would not require more than "occasional *hostile* activities." (Tr. 44)(emphasis added). The ALJ may have misspoken, since the word "postural" should have been used in place of the word "hostile." It is also possible that the court reporter did not hear the ALJ clearly, mistaking the word "postural" for the word "hostile." In any event, there is no indication from Bond that Day's testimony was affected by this potential mispronunciation. Regardless of whether the word "hostile" appears in the transcript because of a mispronunciation or a typographical error, Bond does not raise this issue in support of his motion for summary judgment. (Doc. Nos. 7 & 11).

*Frankenfield* by rejecting Dr. Falk's assessment. Dr. Falk's opinion was contradicted by the earlier opinions of Dr. Foster, Dr. Kang and Dr. Wyszomierski. This is not a situation in which the opinion of a treating physician has been discounted merely because of a claimant's ability to engage in minimal daily activities. Moreover, Bond's daily activities were a valid consideration relevant to his credibility as a witness. *Traylor v. Astrue*, 668 F.Supp.2d 624, 629-630 (D.Del. 2009). Even though Bond's hunting activities may have been confined to a month-long turkey hunting season, the ALJ was entitled to consider such activities in relation to Bond's assertion that he needed to lie down on a periodic basis during the course of a typical day. It was not unreasonable for the ALJ to assume that an individual who routinely needed to lie down because of back pain would not be inclined to regularly position himself inside of a small "blind" for the purpose of luring a turkey.

## F. Conclusion

For the foregoing reasons, the Commissioner's decision denying Bond's application for disability insurance benefits is "supported by substantial evidence." 42 U.S.C. § 405(g). Accordingly, it is respectfully recommended that the Plaintiff's motion for summary judgment (*Document No. 6*) be denied, and that the Defendant's motion for summary judgment (*Document No. 9*) be granted. It is further recommended that the administrative decision of the Commissioner of Social Security be affirmed. In accordance with 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2), the parties may file written objections to this report and recommendation within fourteen (14) days of the date on which they are served with copies of it. Any party opposing the objections shall have fourteen (14) days from the date of service of the objections to respond thereto.

/s/ Susan Paradise Baxter
Susan Paradise Baxter
United States Magistrate Judge

cc: All counsel of record