**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DALTON WATT BOND,          )
                                       )
          Plaintiff,       )
                                       )     Civil Action No. 09-263 Erie
                                       )
              v.          )
                                       )
MICHAEL J. ASTRUE,        )
Commissioner of Social Security,   )
                                       )
          Defendant.    )

## MEMORANDUM OPINION AND ORDER

McLAUGHLIN, SEAN J., District Judge.

### I. INTRODUCTION

Plaintiff, Dalton Watt Bond ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* Plaintiff filed an application for DIB claiming disability due to, *inter alia*, a back impairment (Administrative Record, hereinafter "AR", 117). His application was denied, and he requested and was granted an administrative hearing before an administrative law judge ("ALJ") (AR 63-67; 71-72). Following a hearing held on April 30, 2009 (AR 19-47), the ALJ concluded, in a written decision dated May 8, 2009, that the Plaintiff was not entitled to a period of disability or DIB under the Act (AR 9-18).

Plaintiff filed his Complaint in this Court on October 16, 2009 challenging the ALJ's decision. The case was referred to United States Magistrate Judge Susan Paradise Baxter for report and recommendation in accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1), and Rules 72.1.3 and 72.1.4 of the Local Rules for Magistrates. Thereafter, cross motions for summary judgment were filed, and the Magistrate Judge filed a report on November 18, 2010, recommending that the Plaintiff's motion for summary judgment be denied and that the Defendant's motion for summary judgment be granted. *See* Report and Recommendation [ECF No. 12]. Plaintiff filed timely objections [ECF No. 13] and this matter is now ripe for disposition. For the reasons set forth below, the Plaintiff's objections will be sustained, the

Defendant's motion will be denied and the Plaintiff's motion be granted only to the extent he seeks a remand for further consideration.

## II. Factual Background

On August 17, 2004, the Plaintiff suffered a work-related back injury when he fell off of a truck (AR 236; 299). Beginning on October 25, 2004, he was seen by Raymond Bridge, M.D., for complaints of low back pain and "right leg symptoms" (AR 205). An MRI conducted on October 27, 2004 revealed that he had two disc herniations, a small left sided herniation at the L4-5 level, and a large central herniation at the L5-S1 level (AR 176). He also had canal stenosis at both levels with nerve root impingement (AR 176). Based upon his clinical examination and the MRI findings, Dr. Bridge referred the Plaintiff to Jithendra Rai, M.D., a pain management specialist, for consideration of epidural steroid injections, but the Plaintiff's insurance company refused approval (AR 205). Dr. Bridge continued to treat the Plaintiff and his back condition stabilized (AR 205).

On January 3, 2005, the Plaintiff complained that his right leg was tingling and he was continued on Celebrex and home stretches (AR 206). Dr. Bridge reevaluated the Plaintiff's condition on March 3, 2005 and reported a positive straight leg raise testing on the right side at sixty degrees (AR 206). He further reported that a Medrol Dosepak had failed to provide the Plaintiff any significant pain relief (AR 206). On April 4, 2005, Dr. Bridge diagnosed the Plaintiff with lumbar radiculopathy and continued him on Celebrex (AR 210). On April 28, 2005, the Plaintiff reportedly stopped working since he could "no longer perform his job effectively" (AR 299). However, on April 29, 2005, Dr. Bridge opined that, while the Plaintiff was still symptomatic, he was able to continue working with the ongoing use of Celebrex (AR 206). Dr. Bridge stated that there was no indication that the Plaintiff was exaggerating his symptoms and if anything, "he trie[d] to minimize his symptoms" (AR 206).

On May 6, 2005, the Plaintiff reported a significant increase in his back and leg pain (AR 211). Physical examination revealed a positive straight leg raise test on the right side with decreased lumbar range of motion (AR 211). Because of his decreased difficulty with motion, Dr. Bridge recommended that he discontinue working, and diagnosed him with lumbar radiculopathy (AR 211). Dr. Bridge noted that the Plaintiff's treatment options were limited due

2

to insurance issues, and continued him on Celebrex and hydrocodone (AR 211).

When seen by Dr. Bridge on June 16, 2005, the Plaintiff reported continuing low back and right leg pain (AR 200). On physical examination, Dr. Bridge reported that his straight leg raise test was positive on the right side and he exhibited a decreased range of lumbar motion (AR 200). He was diagnosed with lumbar radiculopathy (AR 200). Dr. Bridge compared the Plaintiff's 1994 MRI with his 1995 MRI, and noted that his 2005 MRI was significant for both an apparent increase in the size of the fragment at the L5-S1 level, and a "clear cut" herniation at the L4-5 level (AR 200). Dr. Bridge indicated that Plaintiff had not advanced to the next treatment level due to insurance issues, and that a request for physical therapy, as well as a request for epidural injection therapy by Dr. Rai, had been denied (AR 201). He continued the Plaintiff on Celebrex and prescribed Norco (AR 201).

In connection with his application for workers' compensation benefits, Plaintiff underwent an independent medical examination performed by Mark Foster, M.D. on July 25, 2005 (AR 177-180). Plaintiff reported a history of back and right leg pain which he attributed to his work-related fall in August 2004 (AR 177). Dr. Foster reported that the Plaintiff exaggerated his symptoms and that the pain the Plaintiff described was "at the level at which people are usually seeking suicide or emergency room care," yet his only treatment was the use of Celebrex (AR 178). Dr. Foster noted that he would have expected the Plaintiff to have undergone epidural treatment if he was in such pain (Ar 178-179). Based upon his physical examination and the diagnostic studies, Dr. Foster found no objective basis for his alleged impairment (AR 179). He stated that he "would not recommend any treatment" based upon the Plaintiff's "lack of interest in treatment with epidural" and opined that he could continue working as a truck driver (AR 179).

Plaintiff returned to Dr. Bridge on August 15, 2005, who reported that he had a positive straight leg raise test on physical examination and diagnosed him with lumbar radiculopathy (AR 198). Dr. Bridge instructed the Plaintiff on home exercises since was financially unable to attend physical therapy (AR 198). When seen on August 29, 2005, the Plaintiff reported that he was "trying to do more" and was performing gentle stretches (AR 197). Straight leg raise test was positive and Dr. Bridge found that he had a limited range of motion on extension and on lateral

bending on either side (AR 197). He was to continue on Celebrex, and was instructed on advanced home exercises with more aerobic activities (AR 197).

On September 27, 2005, the Plaintiff reported that his back discomfort was fairly constant, both in location and severity, and that it was present most of the time (AR 195). Dr. Bridge noted that "[s]upine continue[d] to be his preferred posture" (AR 195). Plaintiff reported that he exercised on the treadmill for 30 minutes daily and was able to take long walks with appropriate rest breaks (AR 195). He was also going to start using free weights for "upper body work" (AR 195). He claimed that prolonged sitting continued to be a problem, and that a six hour trip to Kentucky had resulted in foot numbness (AR 195). On physical examination, Dr. Bridge reported that the Plaintiff had an antalgic gait, with minimal external hip rotation (AR 195). His straight leg raise test was positive on the right side, negative on the left side (AR 195). Dr. Bridge prescribed Celebrex and hydrocodone (AR 195). He noted that because the Plaintiff now had "the luxury of some insurance," he would be rescheduled for an appointment with Dr. Rai (AR 195). Plaintiff informed Dr. Bridge that his former job was no longer available to him (AR 195).

Plaintiff was evaluated by Dr. Rai on October 27, 2005 and reported low back pain with frequent radiation down the right lower leg to the right ankle (AR 193). Plaintiff indicated that prolonged activities bothered him and that lying down and resting afforded some relief (AR 193). He reported that pain medications and physical therapy had helped some, but "not a whole lot" (AR 193). On physical examination, Dr. Rai found lumbar tenderness, limited flexion, and a positive straight leg raise on the right side (AR 194). He formed an impression of lumbar radiculopathy, lumbar disc displacement and degenerative disc disease (AR 194). He recommended lumbar epidural steroid injection therapy (AR 194).

Plaintiff returned to Dr. Bridge for follow up on November 2, 2005 and continued to complain of right leg and low back pain (AR 192). He reportedly exercised 30 minutes a day on the treadmill and performed flexion-based low back stretching exercises (AR 192). Plaintiff stated that he re-injured his back on October 31, 2005 when he "move[d] more quickly than his back was ready to allow," and since that time, had experienced more buttock and thigh pain (AR 192). On physical examination, Dr. Bridge reported that he was able to walk on his heels and

toes, but walked "stiff-legged" and had some difficulty with tandem gait (AR 192). His sciatic notch punch tenderness was positive on the right side only, and he had no paravertebral spasm (AR 192). Dr. Bridge diagnosed lumbar radiculopathy, one year post injury, unimproved (AR 192). It was noted that the Plaintiff was scheduled for an epidural injection, had adequate medication and was "using them appropriately" (AR 192).

On December 9, 2005, Plaintiff had an epidural injection performed by Dr. Rai which reportedly helped with the intensity of his pain (AR 181). When seen by Dr. Rai for follow-up on January 6, 2006, his straight leg raise test was negative bilaterally (AR 181). He was scheduled for another injection (AR 181).

Plaintiff returned to Dr. Bridge on January 10, 2006 and reported that the injection had not alleviated his pain (AR 191). He stated that he was spending time on the exercise bike and walking, but was not driving professionally and was limiting his personal driving due to discomfort (AR 191). Physical examination revealed a L4-5 sensory deficit on the right compared to the left, and he had a positive straight leg raise on the left (AR 191). He was diagnosed with lumbar disc herniation with lumbar radiculopathy, and Dr. Bridge referred him for a neurosurgical evaluation (AR 191).

Plaintiff was evaluated by James D. Kang, M.D. on February 27, 2006 (AR 299-300). Plaintiff complained of low back pain with pain radiating into his right posterior thigh down to his right lateral shin and stated that he had stopped working on April 28, 2005 (AR 299). Plaintiff reported that home physical therapy and epidural steroid injections had not provided any significant relief (AR 299). On physical examination, his lower extremities revealed 5/5 strength bilaterally with hip flexion and knee extension (AR 299). Dr. Kang found the Plaintiff had some weakness on the right side, was unable to do a single leg toe raise, had difficulty performing heel walking on the right side, had a positive straight leg raise on the right, and had a diminished Achilles tendon reflex on the right (AR 299). Dr. Kang reviewed the Plaintiff's previous MRI's from 2004, and noted that his disc herniation at the L4-5 level was small, but the herniation at the L5-S1 level was large and causing significant foraminal stenosis on the right side (AR 300). He was assessed with a herniated nucleus pulposus at L5-S1 with radiculopathy (AR 300). Dr. Kang ordered a new MRI in order to formulate a treatment plan (AR 300). This MRI, conducted on

5

March 14, 2006, revealed a central and left paracentral disc herniation at the L4-5 level, and a central and slightly rightward disc herniation at the L5-S1 level (AR 305).

Plaintiff returned to Dr. Bridge for follow up on March 16, 2006 and reported that he was unable to walk on the treadmill due to right leg pain (AR 190). He was using Norco, Celexa and hydrocodone (AR 190). On physical examination, straight leg raise on the left was positive at 60 degrees and positive on the right at 30 degrees, standing on the toes of a single foot was difficult on the right side, and he had positive sciatic notch punch tenderness bilaterally with some symptoms crossing the midline (AR 190). He was diagnosed with lumbar radiculopathy (AR 190).

Plaintiff had a lumbar laminectomy of the L4-5 level and bilateral foraminotomies at the L4-5 and L5-S1 levels on May 16, 2006 performed by Dr. Kang (AR 297-298). When seen by Dr. Kang on June 9, 2006, Plaintiff reported that overall, his pain was "much better" but that he still suffered from numbness in his right foot area (AR 295). Dr. Kang reported that his x-rays showed a stable laminectomy and he was neurologically normal on physical examination (AR 295). Dr. Kang stated that the Plaintiff was doing "very well" and started him on a course of physical therapy (AR 295). Dr. Kang expressed the hope that the Plaintiff could return to work, which the Plaintiff was considering (AR 295).

Plaintiff began physical therapy on June 21, 2006 (AR 229). Throughout June and July of 2006, the Plaintiff complained of parasthesias in his right lower extremity (AR 222-228).

On July 6, 2006, the Plaintiff reported to Dr. Bridge that he was doing well after surgery (AR 189). He was walking approximately five miles a day and was undergoing physical therapy (AR 189). He was on no medications, having discontinued the Celebrex due to tinnitus (AR 189). Dr. Bridge prescribed Celebrex (AR 189). By the end of July 2006, physical therapy progress notes reflect that the Plaintiff reportedly had less pain (AR 222).

Plaintiff returned to Dr. Bridges on August 7, 2006, and stated that he was doing "reasonably well" and that he was walking five miles a day on dirt roads (AR 187). He indicated that his back was still sore on occasion, that he still had L4-5 pattern radicular symptoms on the right side, and that driving and prolonged sitting bothered him (AR 187). Dr. Bridge prescribed Neurontin along with the Celebrex (AR 188). Physical therapy progress notes for the month of

August 2006 indicate that the Plaintiff had no specific complaints and he consistently reported improvement in his condition (AR 220-221).

When seen by Dr. Kang on September 11, 2006, Plaintiff had no major complaints, but still had some right foot numbness (AR 294). His physical examination was unremarkable and Dr. Kang reported that he was doing "reasonably well" (AR 294). Dr. Kang noted that the Plaintiff was eager to return to his job as a truck driver, and Dr. Kang was of the view he would be able to do so within two to three months (AR 294). Physical therapy progress notes for September 2006 show no specific complaints, and when seen on October 25, 2006, the Plaintiff stated that was gradually improving (AR 217-218).

On February 7, 2007, the Plaintiff was seen by Stephen Hardy, D.O., who felt that the Plaintiff should return to Dr. Kang for his complaints of back and leg pain (AR 231).[1] Plaintiff reported that he had performed some lumber-cutting work and that it had been a "bad choice" (AR 231).

Plaintiff returned to Dr. Kang on March 9, 2007, and reported that he was driving tractor trailers and performing some work, but was experiencing increased numbness and tingling pain in his right leg (AR 293). On physical examination, his lumbar flexion/extension was supple and he was neurologically normal (AR 293). Dr. Kang stated that he was "doing well" and that his increased activities were "probably" stressing the epidural scar and nerve roots, suggesting there were not "any major issues ongoing" (AR 293). He prescribed Neurontin and instructed the Plaintiff to call if his symptoms worsened, but otherwise he was to return in one year for new x-rays (AR 293).

On April 26, 2007, Dr. Hardy examined the Plaintiff, who complained of numbness and pain in his right foot (AR 230). Dr. Hardy questioned Dr. Kang's assessment, noting that a surgeon might "not admit that a recurrent disc may have occurred" (AR 230). He diagnosed the Plaintiff with lumbar radiculopathy and failed back surgery, and ordered an MRI (AR).

An MRI conducted on May 3, 2007 showed that the Plaintiff had epidural fibrosis in the left paracentral region at the L4-5 level, and a broad based central disc herniation at the L5-S1 level with no significant impingement upon the thecal sac, but with apparent impingement upon

---

[1]Plaintiff began seeing Dr. Hardy when Dr. Bridge retired (AR 282).

the right S1 nerve root (AR 259).

Plaintiff began treatment with Denise Falk, D.O. and/or her associate, John Balmer, D.O., on June 26, 2007 for his complaints of low back pain (AR 282-284).[2] He reported taking Celebrex and Vicodin for pain with "good relief" (AR 282). On physical examination, Dr. Falk found no tenderness of the spine or paravetebral area, but found he had a limited range of motion with discomfort and decreased strength in his right hip as compared to his left hip (AR 283). She diagnosed the Plaintiff with lumbar disc disorder and prescribed Ultracet (AR 283-284).

On July 26, 2007, the Plaintiff complained of low back pain and more muscle spasms (AR 280). His physical examination remained the same and Dr. Falk adjusted his pain medications (AR 281).

When the Plaintiff was seen by Dr. Falk on August 21, 2007, he continued to complain of low back pain, claiming that it had worsened since his July visit and was as painful as it was prior to surgery (AR 278). He further reported right leg weakness and tingling that he claimed never went away (AR 278). He informed Dr. Falk that his most recent MRI showed a recurrent herniated disc (AR 278). Plaintiff indicated that although he took Celebrex, Skelaxin and Vicodin on a daily basis, he still had pain, although it was "bearable" (AR 278). His physical examination remained unchanged, and Dr. Falk recommended that he follow up with Dr. Kang (AR 279).

Plaintiff returned to Dr. Kang on September 10, 2007, and reported that he had quit his job as a truck driver because it was "too much" (AR 289). On physical examination, Dr. Kang reported that his lumbar flexion and extension was supple, and his neurological, motor and sensory examinations were normal (AR 289). Dr. Kang did not review the MRI films, but reviewed the MRI report and noted that it showed a mild recurrent disc herniation at the L5-S1 level, but the central canal was wide open and there was no signs of nerve root impingement (AR 289). Dr. Kang told the Plaintiff he was experiencing mechanical back pain and would not benefit from a lumbar fusion (AR 289). He recommended that the Plaintiff continue with pain management and "hang in there" with his symptoms (AR 289). Dr. Kang stated that the Plaintiff should take some time off and then return to work, since he did not believe he would "damage

---

[2]Plaintiff began seeing Dr. Falk after Dr. Hardy stopped practicing (AR 282).

anything by trying to return to work" (AR 289). He noted that the Plaintiff would have some "indolent symptoms" off and on since his disc was going through some arthritic changes (AR). Dr. Kang told the Plaintiff that if he mailed him the MRI studies, he would review them personally and call him if his opinion changed (AR 289).

On October 1, 2007, the Plaintiff was seen by Dr. Falk for follow up, and reported that he had recently seen Dr. Kang (AR 330). Plaintiff stated that he still was not working due to pain (AR 330). He indicated that he tried to stay active, riding the lawn mower and carrying approximately 10 pounds of grain on the farm, but that he needed to rest for one hour after working for one half hour (AR 330). Dr. Falk found no tenderness of the spine or paravetebral area, but found that the Plaintiff had a limited range of motion on flexion to 45 degrees with discomfort and reduced right hip strength of 4/5 as compared to his left hip (AR 331). She diagnosed the Plaintiff with intervertebral lumbar disc displacement without myelopathy and refilled his medications (AR 331).

On October 5, 2007, Dr. Mary Ellen Wyszomierski, a non-examining state agency reviewing physician, reviewed the medical evidence of record and opined that the Plaintiff could perform a limited range of light work involving only occasional climbing, balancing, stooping, kneeling, crouching or crawling, with no exposure to vibration and other work-related hazards (AR 306-310). Dr. Wyszomierski summarized the medical findings, noting that the medical evidence established that the Plaintiff had degenerative disc disease of the lumbar spine (AR 311). She further noted that surgery resulted in significant improvement of his symptoms but "not total resolution" (AR 311). While the Plaintiff had undergone physical therapy in the past, he was not attending physical therapy at the time of her assessment, he was independent in self care, took care of his animals, was able to drive and could lift 50 pounds (AR 312). She found the Plaintiff's subjective complaints of pain "partially credible" and gave some consideration to Dr. Kang's view that the Plaintiff could return to his previous work as a truck driver (AR 312).

Plaintiff returned to Dr. Falk on February 21, 2008 and complained of ongoing back pain and intermittent numbness and tingling in his right leg (AR 327). Physical examination showed no spinal or paravertebral tenderness and no swelling, but he had a limited range of motion on flexion to 45 degrees with discomfort at extremes; his left hip strength was rated at 5/5 and his

9

right hip strength was rated at 4/5 (AR 327). Dr. Falk adjusted his medication regimen (AR 327).

On May 20, 2008, Plaintiff reported experiencing more muscle spasms, but stated that he was unable to afford medication or further testing (AR 324). Plaintiff complained of intermittent numbness and tingling of his right leg (AR 324). His physical examination remained the same, except Dr. Falk found muscle spasm present (AR 324). His distal lower extremity strength was intact, and he walked with a normal gait (AR 324). Dr. Falk gave him samples of Skelaxin (AR 325).

Plaintiff reported to Dr. Balmer on October 3, 2008 that he suffered from constant lower back discomfort radiating down his leg which was exacerbated with bending (AR 322). He was able to alleviate his pain by "laying flat" (AR 322). Plaintiff took Aleve when needed because he could not afford Skelaxin (AR 322). On physical examination, Dr. Balmer found no spinal tenderness, but lumbar paravertebral spasm was noted and he exhibited a limited range of motion on spinal flexion (AR 323).

On January 6, 2009, the Plaintiff reported increasing low back pain with right leg/foot pain and intermittent numbness (AR 319). Plaintiff stated that his symptoms had worsened and he was unable to afford an MRI due to a lack of insurance (AR 319). He complained of right foot numbness when walking or sitting (AR 319). He claimed he needed frequent rest periods and was only able to alleviate his pain by intermittently lying down during the day (AR 319). He took Aleve and Flexeril, but his muscle spasms were no longer controlled by Flexeril and was unable to afford other medication (AR 319). Plaintiff reported that his only activity was cleaning animal pens (AR 319). On physical examination, Dr. Balmer found tenderness of the Plaintiff's lower lumbar area and into the right SI area (AR 320). He recommended an MRI when the Plaintiff was financially able, and continued him on Aleve and Flexeril (AR 320).

Plaintiff returned to Dr. Falk on February 23, 2009 and complained of increased back pain with cramping and tingling in his legs (AR 316). Plaintiff reported that he was slow in bathing, toileting and dressing, and that he needed assistance with cleaning (AR 316). He did indicate that he was able to perform barn work, such has feeding the mules and sweeping the floor, but claimed it was not laborious work (AR 316). Plaintiff stated however, that he needed

to rest twenty minutes to an hour between chores until his back pain ceased (AR 316). He further stated that he sometimes needed to lay down for ten minutes to an hour depending upon the amount of bending and walking activity he engaged in (AR 316). Plaintiff reported that he quit walking due to back pain, was unable to walk 500 yards to his mother's house, and could not stand for more than five minutes (AR 316). Dr. Falk noted that the Plaintiff walked with a slow gait, and on physical examination, she found tenderness at the L4 paravertebral area bilaterally and L5 paravertebral area bilaterally, but no tenderness of the spine (AR 317). She further found that the Plaintiff exhibited stiffness and a limited range of motion with significant discomfort, and his hip strength was 5/5 but with bilateral pain noted (AR 317). She assessed him with low back pain and intervertebral lumbar disc displacement without myelopathy, and prescribed Meloxicam, Vicodin, Lidoderm patches and Cyclobenzaprine A(R 317). She noted that the Plaintiff was unable to afford more testing due to a lack of medical insurance (AR 317).

Finally, on March 16, 2009, Dr. Falk completed a medical source statement indicating that the Plaintiff suffered from chronic pain, that such pain prevented him from standing or sitting for prolonged periods of time, and that it was "reasonably necessary" for him to lie down at "unpredictable times" in order to obtain pain relief (AR 315).

Plaintiff testified at the administrative hearing held by the ALJ on April 30, 2009 that he attempted to return to work as a self-employed logger for approximately two to three months in 2007, but his lower back and leg impairments returned to their pre-surgery state and he was unable to continue working (AR 26-27). He stated that he felt "a lot better" after back surgery in May 2006, and walked up to five miles a day for four to six weeks post-surgery (AR 29-30). He further stated, however, that he had to stop walking due to lower back and leg pain (AR 30). Plaintiff testified that after surgery, his back condition improved with physical therapy, but his right leg remained weak (AR 31). Other than physical therapy, the Plaintiff testified that he had no other treatment for his back pain, but took hydrocodone and Cyclobenzaprine (AR 31-32). He stated that he took the muscle relaxer every day, and the hydrocodone two or three times per week, which "work[ed] well" and took "the edge off" his pain (AR 32; 39). In order to alleviate his back pain, the Plaintiff testified that, on a typical day, he would lie down for two to three hours (AR 40).

Plaintiff stated that he was able to lift a 50 pound bale of hay once a day to feed his mules and could occasionally pick up 20 pounds, but had problems carrying weight (AR 34). He further testified that he could sit for 45 minutes and walk "a couple of hundred yards" (AR 34-35). He was able to sit and/or kneel in a blind and hunt turkey two or three times per week, but avoided walking too far (AR 35; 42). Plaintiff testified that at the time of the administrative hearing, he had no insurance and paid out of pocket for his medical treatment (AR 38). He stated that he was unable to take greater amounts of pain medication because Dr. Falk required urine testing for larger amounts, and he could not afford testing (AR 39). He further stated that he would seek further medical treatment for his back impairment if he had insurance (AR 42).

The ALJ asked Paula Day, the vocational expert, to assume an individual of the same age, education and work experience as the Plaintiff, who was able to perform light work which would allow the individual an opportunity to alternate positions between sitting and standing, which would not require more than occasional postural activities, and which would not expose the individual to any heights or hazards (AR 44). The vocational expert testified that such an individual could perform the light jobs of an office helper, order caller and warehouse checker (AR 44-45).

Following the hearing, the ALJ issued a written decision finding the Plaintiff was not entitled to a period of disability or DIB within the meaning of the Act (AR 9-18). He subsequently filed the instant action.

### III. Legal Standards

*A. Standard of Review of an ALJ's decision*

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995). Additionally,

if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3rd Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

  *B. Standard of Review of a Report and Recommendation*

  When objections are filed to the report and recommendation of a magistrate judge, the district court makes a *de novo* determination of those portions of the report or the proposed findings or recommendations to which objections are made. 28 U.S.C. § 636(b)(1); *see also Sample v. Diecks*, 885 F.2d 1099, 1106 n.3 (3rd Cir. 1989). In so doing, the court may "accept, reject, or modify, in whole or in part, the findings and recommendations" contained in the report. 28 U.S.C. § 636(b)(1); *see also Brophy v. Halter*, 153 F. Supp. 2d 667, 669 (E.D.Pa. 2001). The court may also, in the exercise of sound judicial discretion, rely on the magistrate judge's proposed findings and recommendations. *See United States v. Raddatz*, 447 U.S. 667, 676 (1980).

## IV. DISCUSSION

  A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not
> engaged in "substantial gainful activity" and (2) that he suffers
> from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S.
> 137, 140-41 (1987). If the claimant shows a severe medical

13

> impairment, the [Commissioner] determines (3) whether the
> impairment is equivalent to an impairment listed by the
> [Commissioner] as creating a presumption of disability. *Bowen,*
> 482 U.S. at 141. If it is not, the claimant bears the burden of
> showing (4) that the impairment prevents him from performing the
> work that he has performed in the past. *Id.* If the claimant satisfies
> this burden, the [Commissioner] must grant the claimant benefits
> unless the [Commissioner] can demonstrate (5) that there are jobs
> in the national economy that the claimant can perform. *Ferguson*
> *v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).

*Jesurum*, 48 F.3d at 117.

Here, the ALJ resolved the Plaintiff's case at the fifth step. At step two, the ALJ found

that the Plaintiff's back disorder was a severe impairment, but determined at step three that he

did not meet or equal any listed impairment in the regulations (AR 11-12). At step four, the ALJ

determined that he could not perform his past relevant work as a truck driver, but retained the

residual functional capacity ("RFC")[3] to perform light exertional work, with the following

limitations: "he must be permitted to sit or stand at will in order to relieve pain or discomfort; he

can perform no more than occasional postural activities (climbing, balancing, stooping, kneeling,

crouching, and crawling); and he is precluded from working at heights or in hazardous

environments" (AR 12). At the final step, the ALJ found that the Plaintiff could perform the jobs

cited by the vocational expert at the administrative hearing (AR 17). The ALJ additionally

determined that the Plaintiff's statements concerning the need to lie down were not credible to

the extent they were inconsistent with his RFC assessment (AR 13). Again, I must affirm this

determination unless it is not supported by substantial evidence.

Plaintiff, in his Objections to the Magistrate Judge's Report and Recommendation,

suggests that the "central issue in this case is whether the plaintiff's pain could result in a need

for him to lie down at unpredictable times in an attempt to obtain pain relief." *See* Plaintiff's

---

[3]"'Residual functional capacity is defined as that which an individual is still able to do despite the
limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3rd Cir.
2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3rd Cir. 1999); *see also* 20 C.F.R. § 404.1545(a). An
individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. §
404.1527(e)(2). In making this determination, the ALJ must consider all the evidence before him. *Burnett*, 220 F.3d
at 121.

Objections p. 1.[4]  He contends, in essence, that the ALJ's rejection of Dr. Falk's opinion in that regard was based on an inadequate, and in some respects, an inaccurate review of the record.  As a result, the Plaintiff argues that substantial evidence does not support the ALJ's rejection of Dr. Falk's opinion that he would need to periodically lie down and that the Magistrate Judge erred in so concluding.

        *A.*      *Evaluation of the treating physician's opinion*

It is by now well established law in this Circuit that, in ruling on a disability claim, the Commissioner "may properly accept some parts of the medical evidence and reject other parts, but she must consider all the evidence and give some reason for discounting the evidence she rejects."  *Adorno v. Shalala*, 40 F.3d 43, 48 (3rd Cir. 1994).  This is especially important when the relevant medical evidence comes from one of the claimant's treating physicians.  *Kent v. Schweiker*, 710 F.2d 110, 115 n.5 (3rd Cir. 1983) ("While the ALJ is, of course, not bound to accept physicians' conclusions, he may not reject them unless he first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected."); *Cotter v. Harris*, 642 F.2d 700, 705-06 (3rd Cir. 1981) ("unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.").

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a long period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3rd Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3rd Cir. 1999) (citations omitted); *see also Adorno*, 40 F.3d at 47.  In choosing to reject a treating physician's opinion, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his own credibility judgments, speculation or lay opinion.  *Plummer*,

---

[4]I agree with that characterization given the Vocational Expert's testimony that such a requirement would preclude employment.

186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3rd Cir. 1988) (holding that "the medical judgment of a treating physician can be rejected only on the basis of contradictory medical evidence" not "simply by having the administrative law judge make a different judgment"); *Moffat v. Astrue*, 2010 WL 3896444 at *6 (W.D.Pa. 2010) ("It is axiomatic that the Commissioner cannot reject the opinion of a treating physician without specifically referring to contradictory medical evidence."). In addition, a treating source's medical opinion concerning the nature and severity of the claimant's alleged impairments will be given controlling weight if the Commissioner finds that the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2). Finally, where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reason for doing so. *See Sykes v. Apfel*, 228 F.3d 259, 266 (3rd Cir. 2000) ("Where the Secretary is faces with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence.").

In rejecting the functional limitation described by Dr. Falk, the ALJ stated:

> On March 16, 2009 Denise Falk, D.O., a treating physician, opined that the claimant's pain prevents him from standing and sitting for prolonged periods and that the severity of his pain necessitates a need to lie down for pain relief at unpredictable times (Exhibit 10F). The undersigned accords this opinion some weight. However, the evidence does not support that Mr. Bond needs to lie down at unpredictable times. There is no evidence of the degree of pain Dr. Falk suggests. The records reveal that the claimant was treated conservatively with medications and physical therapy following surgery in May 2006, and that he is maintained on medications from which he benefits. Dr. Falk's opinion is not well supported by the medical evidence of record, the level of care, or the activities of daily living.

(AR 15). Here, I find that the ALJ failed to adequately address all pertinent medical evidence in Dr. Falk's treatment records in his evaluation of Dr. Falk's opinion. For example, while the ALJ attempted to summarize Dr. Falk's treatment note entries, the ALJ's opinion discusses only three treatment note entries covering the period from October 2007 through February 2009 (AR 14). Plaintiff has been treated by Dr. Falk however, since June 2007, and most, if not all, of Dr. Falk's treatment notes consistently document ongoing complaints of back and leg pain, as well as clinical findings, such as back spasms and limited range of motion (AR 278; 280-281; 283-284;

322; 324; 330).

Also noticeably absent from the ALJ's discussion of Dr. Falk's treatment notes are the entries by Dr. Falk and/or Dr. Balmer documenting the Plaintiff's continuing reports of the need to lie down in order to alleviate his back pain. These entries reflect that on October 1, 2007, the Plaintiff reported that he needed to rest for one hour after working for one half hour (AR 330). On October 3, 2008, the Plaintiff reported that he suffered from constant lower back pain which he was able to alleviate by "laying flat" (AR 322). On January 6, 2009, the Plaintiff stated that he was only able to alleviate his pain by intermittently lying down during the day (AR 319). On February 23, 2009, the Plaintiff informed Dr. Falk that he needed to lay down for ten minutes to an hour depending upon the amount of activity he had engaged in (AR 316).

The Magistrate Judge concluded that the Plaintiff's need to lie down was not "corroborated by objective medical evidence." *See* Report and Recommendation p. 11. In that regard, she noted:

> The references to Bond's need to lie down were included within the "subjective" portions of Dr. Falk's treatment notes. (Tr. 316, 319, 322). They were not grounded in medical evidence aside from Bond's subjective complaints. A lack of clinical data to support a proposed limitation can constitute evidence that the limitation is not truly present. *Newhouse v. Heckler*, 752 F.2d 283, 286 (3d Cir. 1985).

Report and Recommendation pp. 11-12. However, as discussed above, the record in fact is replete with objective medical evidence arguably consistent with the Plaintiff's claimed level of pain. For example, in addition to Dr. Falk's records documenting back spasms and limited range of motion, a lumbar x-ray dated March 9, 2007 was read as reflecting advanced degenerative disc disease at L5-S1 and mild disc space narrowing at the L4-5 level (AR 302). A lumbar MRI dated May 3, 2007 reflected "[r]ecurrent central disc herniation at the L5-S1 level" with "apparent impingement upon the right S1 nerve root" with hypertropic changes and narrowing bilaterally (AR 259).

In addition to the ALJ's failure to have addressed the previously described portions of Dr. Falk's records, he offers no explanation at to what "medical evidence" he relied on in rejecting Dr. Falk's opinion. Moreover, the ALJ provides no explanation for his decision to accord the opinion of the state agency reviewing physician "significant weight."

For the reasons set forth above, I find the ALJ's explanation for rejecting Dr. Falk's opinion as to the Plaintiff's need to lie down periodically was inadequate. Consequently, this matter will be remanded to the ALJ in order for him to address the previously described portions of Dr. Falk's records and adequately explain his rejection of Dr. Falk's opinion.

B.    Credibility determination

Plaintiff further challenges the ALJ's credibility assessment, claiming that the ALJ failed to appropriately consider his subjective complaints of pain. An ALJ must consider subjective complaints by the claimant and evaluate the extent to which those complaints are supported or contradicted by the objective medical evidence and other evidence in the record. *See* 20 C.F.R. § 404.1529(a); *Hartranft v. Apfel*, 181 F.3d 358, 362 (3rd Cir. 1999) (citing 20 C.F.R. § 404.1529). In assessing subjective complaints, Social Security Ruling (*"SSR"*) 96-7p and the regulations provide that the ALJ should consider the objective medical evidence as well as other factors such as the claimant's own statements, the claimant's daily activities, the treatment and medication the claimant has received, any statements by treating and examining physicians or psychologists, and any other relevant evidence in the case record. *See* 20 C.F.R. § 404.1529(c); *SSR* 96-7p, 1996 WL 374186 at *2. As the finder of fact, the ALJ can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. *See Baerga v. Richardson*, 500 F.2d 309, 312 (3rd Cir. 1974). The ALJ is empowered to evaluate the credibility of witnesses and his determination is entitled to deference by this Court. *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3rd Cir. 1983).

Here, the ALJ found:

> ...The claimant's allegation of totally debilitating limitations is not supported by the diagnoses, course of treatment, and medications. Nor is it supported by the residual functional capacities, the progress notes, the activities of daily living, or the social functioning. As noted, Mr Bond testified that he is able to lift 20 pounds, sit and stand one-half hour to 45 minutes, and walk 100 yards. However he hunts turkeys 2 to 3 times per week, weighing 12 to 20 pounds and takes them home; feed mules; lifts 50 pound bales of hay; and does archery with a cross-bow. He tried logging for 3 months in 2007. Those activities are not consistent with debilitating limitations. Moreover, the claimant was treated with injections for his back disorder, underwent surgery in May 2006, and was treated with physical therapy with gradual improvement. He has been diagnosed with degenerative joint disease and possible recurrent herniation. However, he has had no further treatment,

other than medications since he received physical therapy. It would seem reasonable that one suffering the pain and limitations alleged by the claimant would require a more intensive level of treatment.

...[T]he undersigned finds Mr. Bond credible to the extent that he would experience back pain with ... lifting/carrying heavy weights, sitting and standing for prolonged periods of time, performing postural activities, as well as working in environmental hazards. The residual functional capacity was reduced to accommodate those limitations. However, the undersigned cannot find that the claimant was precluded from all work activity, as this is disproportionate to the record as a whole.

(AR 15-16). As an initial matter, given the Court's previous finding relative to the ALJ's inadequate review of the medical record, it follows that appropriate consideration could not have been given to the Plaintiff's subjective complaints of pain. *See Mason v. Shalala,* 994 F.2d 1058, 1068 (3rd Cir. 1993); *Krizon v. Barnhart,* 197 F. Supp. 2d 279, 290 (W.D.Pa. 2002). A few brief comments by way of direction on remand however, are appropriate.

The ALJ failed to consider the Plaintiff's work history in his opinion. Recently, in *Sementilli v. Astrue,* 2010 WL 521183 (W.D.Pa. 2010), this Court remanded the claimant's case for reconsideration of the claimant's credibility stating:

... [T]he ALJ did not discuss the Plaintiff's long work history in the context of his overall credibility determination and only mentioned his unsuccessful attempts to return to work as circumstantial evidence of an ability to perform work of a less demanding nature. In light of the above case law, I find that the ALJ was obligated to consider the Plaintiff's long work history and attempts to return to work in his overall credibility analysis. ...

*Sementilli,* 2010 WL 521183 at *8.

In this case, the Plaintiff worked as a bus driver and/or truck driver for approximately 19 years, since 1986 (AR 127). He also worked simultaneously as a logger for approximately seven years, from 1994 to 2001 (AR 127). In addition, the Plaintiff attempted to return to work for a short period of time as a logger/truck driver (AR 127). *See Reider v. Apfel,* 115 F. Supp. 2d 496, 507 (M.D.Pa. 2000) (finding that ALJ failed to properly address claimant's work history and post-accident unsuccessful work attempts); *Sidberry v. Bowen,* 662 F. Supp. 2d 1037, 1039-40 (E.D.Pa. 1986) (ALJ erred in ignoring claimant's work history and efforts to hold down a job); *accord, Corley v. Barnhart,* 102 Fed. Appx. 752, 755 (3rd Cir. 2004) (refusing to remand a case

based upon the ALJ's failure to have commented on the claimant's work history, noting that in the cases that were remanded "the claimant not only had a long and productive work history, but also showed evidence of severe impairments or attempted to return to work, and neither of these circumstances exist here"). On remand, the ALJ is directed to consider the Plaintiff's work history in this case in the context of his overall credibility determination.

## V. Conclusion

For the reasons discussed above, the Plaintiff's Objections will be sustained, the Defendant's Motion will be denied and the Plaintiff's Motion will be granted only to the extent he seeks a remand for further consideration. The matter will be remanded to the Commissioner for further proceedings.[5] An appropriate Order follows.

## ORDER

AND NOW, this 22nd day of February, 2011, upon consideration of the cross-motions for Summary Judgment, the Report and Recommendation of the Magistrate Judge and the Plaintiff's Objections thereto,

IT IS HEREBY ORDERED that the Plaintiff's Objections [ECF No. 13] are SUSTAINED and the Report and Recommendation [ECF No. 12] is NOT ADOPTED as the opinion of the Court.

IT IS FURTHER ORDERED that the Defendant's Motion for Summary Judgment [ECF No. 9] is DENIED and the Plaintiff's Motion for Summary Judgment [ECF No. 6] is GRANTED only to the extent he seeks a remand for further consideration by the Commissioner. The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with this Memorandum Order.

The clerk is directed to mark the case closed.

---

[5]The ALJ is directed to reopen the record and allow the parties to be heard via submissions or otherwise as to the issues addressed in this Memorandum Opinion. *See Thomas v. Comm'r of Soc. Sec.*, 625 F.3d 800-01 (3rd Cir. 2010).

s/ Sean J. McLaughlin
                                        United States District Judge

cm: All parties of record.